COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judges Annunziata and Clements
Argued at Alexandria, Virginia


BERNICE WILSON

                                    MEMORANDUM OPINION* BY
v.    Record No. 2606-02-4          JUDGE ROSEMARIE ANNUNZIATA
                                         JULY 15, 2003
FAIRFAX COUNTY DEPARTMENT
 OF FAMILY SERVICES


            FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                    Leslie M. Alden, Judge

        Francis C. McBride for appellant.

        Dennis R. Bates, Senior Assistant County
        Attorney (David P. Bobzien, County Attorney;
        Peter D. Andreoli, Jr., Deputy County
        Attorney; Jessica C. Friedman, Assistant
        County Attorney; Office of the County
        Attorney, on brief), for appellee.

        (Michael S. Arif; Martin, Arif, Petrovich &
        Walsh, on brief), Guardian ad litem for the
        minor children.  Guardian ad litem
        submitting on brief.

        Glenn L. Clayton II, Guardian ad litem, for
        father, Justin Wilson, Sr.


     On September 4, 2002, the circuit court determined that

Bernice Wilson's minor son, A., was an abused and/or neglected

child and ordered him to be placed in approved foster care with

the goal of "return home."  Wilson appeals on the following

grounds:  1) the Fairfax County courts did not have subject

_____

     * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

matter jurisdiction over the child because he was found in Spotsylvania County and he and Wilson no longer resided in Fairfax County; 2) the evidence failed to show by a preponderance that the child was abused and/or neglected; and 3) the trial court erred in allowing Detective Tim Briner to testify regarding computer-generated records because the information was hearsay.  For the reasons that follow, we affirm.

## Facts

Bernice Wilson resided in Fairfax County with her son, A., from June 2000 until May 2001.  At the end of May 2001, Wilson reportedly moved out of Fairfax County but did not set up another permanent residence.  In June and July 2001, Wilson stayed with her mother, Earlene Young, in Spotsylvania County, and later in motels in Fredericksburg.  During that time, Wilson maintained contacts in Fairfax County, including contact with her Fairfax County probation officer and the Fairfax County juvenile court ("the juvenile court"), because her two eldest children, J. and K., were in the county's foster care system.

On July 23, 2001, Wilson brought A. to Fairfax County for a medical appointment.  A. had tubes surgically placed in his ears that day and required prescribed medication as follow-up care. Following the appointment, Wilson met with her probation officer, Bonnie Parigian, in Fairfax City.  While Wilson met with Parigian, A. stayed in the car in the parking lot with

-

Wilson's companion, William Scott. At the end of the probation meeting, Wilson was met by Detective Timothy Haynes of the Fairfax City Police Department, who brought her in for questioning in connection with charges of robbery and prostitution that had occurred at the Anchorage Motel in Fairfax City. Following her questioning, Wilson was arrested and incarcerated at the Fairfax County Adult Detention Center. Wilson left A. in the physical custody of Scott. Wilson testified that she had instructed Scott to take A. to Young's home if anything happened to her.

During her July 23, 2001 interview with Detective Haynes, Wilson reported that she was concerned about leaving A. with Scott because she did not know what Scott would do to A. and she knew that Scott had a Desert Eagle handgun. Wilson had been involved in altercations with Scott in which she had felt the need to call the police.

On July 24, 2001, Wilson filed a police report with the Fairfax City Police Department alleging that A. had been abducted by Scott. Detective Haynes was assigned to the abduction case. From his investigation, Detective Haynes learned that Scott was a suspect in the robbery and prostitution case in which Wilson had been arrested. The detective further determined that Scott had allegedly used force in the robbery. Detective Haynes ran Scott's name through the National Crime

-

Information Center and discovered that Scott had been involved in other crimes of violence.

On July 25, 2001, Detective Haynes found A. at the home of his grandmother, Earlene Young, in Spotsylvania County. The abduction report was outstanding at that time.

When Haynes found A., he contacted the Fairfax County Department of Family Services ("the Department") and the Spotsylvania Sheriff's Department contacted the Spotsylvania County Department of Social Services ("the Spotsylvania Department"). The Spotsylvania Department declined to become involved in A.'s case because he had been abducted from Fairfax County. Accordingly, the Department accepted A.'s case and determined that the child was without an appropriate caretaker.[1]

Detective Haynes brought A. to Fairfax County, where he was placed in the custody of the Department. When A. was removed from Young's house, the Department was aware of the arguing, assault, and domestic violence incidents occurring at Young's home and the ongoing police involvement there. In June 2001, Young had been denied custody of A.'s twin siblings by the Fairfax juvenile court. The juvenile court's final order regarding Young, introduced into evidence, expressly stated that Young's custody petition was denied because of continuing

---

[1] Fairfax County is responsible for providing child protective services in Fairfax City pursuant to a city-county agreement.

-

domestic violence and lack of stability in her home. The Department did not believe Young was an appropriate caretaker and was not aware of any other suitable relative placements for the child. He was not returned to Wilson's care because she was being held in jail on the robbery and prostitution charges. A.'s father was also incarcerated and also was unable to take custody of A.

At trial, Tim Briner, a detective with the Spotsylvania Sheriff's Department, testified over Wilson's objection, regarding the sheriff's department's records of domestic calls involving Young's residence. He explained the computerized system the sheriff's department uses to keep records of all incoming calls and the manner in which additional reports become part of the system. For each call the sheriff's department receives, dispatchers input the call into the computer system, which then generates an incident number. Based on the content of the call, the dispatcher inputs additional information into the computer as necessary, under the incident number. Once the initial information is taken, the dispatcher dispatches an officer to the call.

Officers responding to the calls generally transcribe any additional information they gather, known as "attachments," and submit them to the police records division of the sheriff's department, who in turn input the attachments into the computer

-

under the appropriate incident number.  Each time the department receives a call, the same process is followed.

Detective Briner testified that he has access to the reports and calls related to a particular incident or address. Detective Briner testified that the sheriff's department received a total of 33 calls for service to Young's residence in 2001, including several calls related to domestic violence and child welfare.  Three of the calls in 2001 were reports of violent domestic assault, to which he responded, and ten calls were related to non-violent domestic incidents.  The detective further testified that his department's records reflect a call reporting an assault at Young's home involving Wilson and Scott on June 6, 2001, to which he responded.

Dr. Kari Moskowitz, a licensed clinical psychologist, testified that in 1998, she assessed Wilson as having a history of serious emotional disturbance characterized by aggressive and emotional outbursts, poor impulse control, poor judgment, and poor problem-solving skills and that those traits interfered with her ability to provide a safe and secure environment for a child.  At the time she saw Wilson, Dr. Moskowitz recommended that Wilson participate fully in individual therapy because her mental health problems required treatment.  Dr. Moskowitz further testified that, in the absence of successful treatment, the best predictor of future behavior is past behavior.  There

-

was no evidence presented at trial showing that Wilson had successfully completed any course of mental health treatment.

The Department offered a number of diagnostic and therapeutic services to Wilson, beginning in 1998. Marlene Freedman, a foster care supervisor with the Department, testified that the Department had made numerous attempts in 1998 to offer Wilson services directed toward her mental health, substance abuse, parenting skills, housing, and her ongoing involvement in domestic violence and criminal activity. Freedman testified that during her involvement with Wilson through October 1999, Wilson never followed through with any of the services offered. Kelly Traver, a foster care social worker with the Department, testified that Wilson had declined all mental health, substance abuse, and housing services offered to her in Fairfax County and failed to establish a permanent residence since her release from jail in September 2001.

Wilson testified that she had a plan in place for the return of A. to her custody. At the time of trial, however, she was temporarily staying at Young's home. Furthermore, she testified that she was employed, but not yet working, and that she was not in therapy as recommended.

## Procedural Background

On July 26, 2001, the Fairfax County Department of Family Services filed a petition in the juvenile and domestic relations district court of Fairfax County, alleging that twenty-one

-

month-old A. was an abused and/or neglected child within the meaning of Code § 16.1-241(A)(1).  On that same date, the juvenile court issued an emergency removal order ("ERO") pursuant to Code § 16.1-251 at the request of the Department. The juvenile court set the matter for a preliminary removal hearing on August 2, 2001, pursuant to Code § 16.1-252.  On August 2, 2001, Wilson objected to the jurisdiction of the juvenile court over the subject matter of the Department's petition.  The juvenile court set a hearing for August 27, 2001 to address the issue of subject matter jurisdiction.  At the hearing, the juvenile court found that it had jurisdiction over the subject matter and that venue was appropriate under the applicable statutory provisions.  The juvenile court set an adjudicatory hearing for September 17, 2001, to determine whether A. was an abused and/or neglected child.

Prior to September 17, 2001, Wilson noted an appeal to the circuit court of Fairfax County of the August 27, 2001 order. On September 17, 2001, the juvenile court stayed the proceedings on the Department's petition pending resolution of the jurisdictional issue in the circuit court, and continued the ERO in effect, pending further proceedings.  On February 26, 2002, the circuit court dismissed Wilson's appeal on the ground that there was no final judgment on the merits and the matter was remanded to the juvenile court for further proceedings.

-

On March 14, 2002, the juvenile court conducted a preliminary removal hearing pursuant to Code § 16.1-252 and an adjudicatory hearing on the merits of the Department's petition alleging that the child was abused and/or neglected. The juvenile court found that A. was a Child in Need of Services ("CHINS") within the meaning of Code § 16.1-228. The juvenile court continued legal custody of the child with the Department and set the matter for a dispositional hearing on April 30, 2002. On April 30, 2002, the juvenile court entered a final dispositional order finding that A. was a child in need of services, continuing legal custody of the child with the Department, and approving the foster care service plan with the goal of a return home.

On May 9, 2002, Wilson noted her appeal to the circuit court of the April 30, 2002 final order. On September 4, 2002, the circuit court heard the Department's petition de novo. By order dated September 5, 2002, the circuit court found that the juvenile court and the circuit court had jurisdiction over the child for the purposes of adjudicating all issues related to the Department's petition. The circuit court further found by a preponderance of the evidence that the child was a neglected child within the meaning of Code § 16.1-228(1). Legal custody of the child was continued with the Department, and the foster care service plan was approved.

-

## Analysis

### I. Jurisdictional Issue

On appeal, Wilson contends the Fairfax County courts did not have subject matter jurisdiction over this case because A. was found in Spotsylvania County after Wilson's arrest. We disagree with this contention.

Code § 16.1-241 governs the resolution of this issue and states, in part:

> [E]ach juvenile and domestic relations district court shall have, within the limits of the territory for which it is created, exclusive original jurisdiction . . . over all cases, matters and proceedings involving: A. The custody, visitation, support, control or disposition of a child: 1. Who is alleged to be abused, [or] neglected . . . except where the jurisdiction of the juvenile court has been terminated or divested . . . .

Code § 16.1-241(A)(1).

"Subject matter jurisdiction is the authority granted to a court by constitution or by statute to adjudicate a class of cases or controversies." Earley v. Landsidle, 257 Va. 365, 371, 514 S.E.2d 153, 156 (1999). In the case at bar, the child, A., is alleged to have been abused and neglected. The statute, by its plain language, does not predicate subject matter jurisdiction on the residence of the child at issue. The statute grants exclusive jurisdiction to juvenile and domestic relations district courts over all "cases, matters and proceedings involving . . . the custody . . . of a child . . .

-

who is alleged to be abused, [or] neglected . . . . " Code
§ 16.1-241.

The record establishes that the juvenile and circuit courts
had subject matter jurisdiction in this case.  After Wilson was
arrested on charges of robbery and prostitution, the initial
allegation of abuse and neglect was reported to the Department.
Social worker Renee Berry stated in a sworn affidavit, that "on
July 25, 2001, Child Protective Services in Fairfax County
received a referral regarding physical neglect, abandonment
[sic] of A[.] . . . age 21 months, by his mother Bernice
Wilson."  Berry was informed that Wilson reported A. as an
abducted child after her arrest.  Additionally, Berry noted in
her affidavit that A. had tubes surgically placed in his ears on
July 23, 2001.  A.'s surgery required follow-up care, including
prescribed medication.  Berry stated, "It is believed [Wilson]
has the medication with her in jail."

Thus, the allegations of A.'s abuse and neglect in Berry's
affidavit, including Wilson's arrest, thus leaving A. without an
appropriate caretaker, and leaving the child without his
prescribed medication, brought the matter within the subject
matter jurisdiction of both the juvenile and circuit courts.

To the extent Wilson challenges venue on appeal, arguing
that she and A. reside in Spotsylvania County and Detective
Haynes ultimately located the child in Spotsylvania County, the
issue is procedurally defaulted because Wilson did not preserve

-

it for appeal, and we decline to address it. See Rule 5A:18; see also Gordon v. Commonwealth, 38 Va. App. 818, 822 n.3, 568 S.E.2d 452, 453 n.3 (2002) ("One consequence of the non-waivable nature of the requirement of subject matter jurisdiction is that attempts are sometimes made to mischaracterize other serious procedural errors as defects in subject matter jurisdiction to gain an opportunity for review of matters not otherwise preserved.").

## II.  Sufficiency of the Evidence

### A.  Removal of the Child

Wilson contends A.'s summary removal from Young's home by Detective Haynes was improper under Code § 16.1-248.9, on the grounds that 1) the detective was not investigating a claim of abuse or neglect, and 2) the child was not in imminent danger. We find Wilson's argument to be without merit.

The removal of a child from parental custody pursuant to Code § 16.1-251 is not a final determination of the child's custody and, therefore, is not appealable.  Within five days of taking a child into custody without the court's approval, the Department of Family Services must file a petition alleging abuse or neglect and must obtain an emergency removal order pursuant to Code § 16.1-251.  It is not until the court finds by a preponderance of the evidence that the child is abused or neglected within the meaning of the statute and issues a final disposition order pursuant to Code § 16.1-278.2 that an appeal

-

may be taken.  See Code § 16.1-278.2(D).  A.'s emergency removal was not a final disposition and, thus, cannot be appealed.

     B.  Determination that the Child was Abused/Neglected

     Wilson next argues that the evidence was insufficient to prove by a preponderance that A. was abused or neglected, as defined by Code § 16.1-228(1).  We find this argument to be without merit.

     The circuit court's judgment, "when based on evidence heard ore tenus, will not be disturbed on appeal unless plainly wrong or without evidence to support it."  Peple v. Peple, 5 Va. App. 414, 422, 364 S.E.2d 233, 237 (1988).  On appellate review, "[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests."  Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1977).  Code § 16.1-228(1) defines a neglected child as any child:

> Whose parents or other person responsible
> for his care creates or inflicts, threatens
> to create or inflict, or allows to be
> created or inflicted upon such child a
> physical or mental injury by other than
> accidental means, or creates a substantial
> risk of death, disfigurement or impairment
> of bodily or mental functions . . . .

Under the statute, and the case law interpreting it, the child need not suffer actual harm or impairment.  See Jenkins v. Winchester Dep't of Social Servs., 12 Va. App. 1178, 1183, 409 S.E.2d 16, 19 (1991) (holding that the "statutory definitions of

-

an abused or neglected child do not require proof of actual harm or impairment having been experienced by the child"). Accordingly, the term "substantial risk" speaks in futuro. See id.

On July 23, 2001, Wilson created a situation in which A., 21 months old at the time and unable to care for himself, was subjected to a substantial risk of death or impairment of bodily or mental function. After her arrest and subsequent incarceration for prostitution and robbery, she left A. in the care of an individual with a history of violent behavior, whom she knew was armed with a handgun, and about whom she expressed concern as a proper caretaker for A., stating he might harm the child. She later filed a police report alleging Scott abducted A. Detective Haynes, of the Fairfax County police, discovered that Scott was Wilson's accomplice in the robbery and that he used force in committing the crime. He ran Scott's name through the National Crime Information Center database and discovered that Scott had been involved in other crimes of violence.

There existed no other suitable caretaker for A. in Wilson's absence. The child's father was incarcerated at the time in Spotsylvania County. Mr. Wilson's parents told Detective Haynes they did not want to be involved. A. was found with his grandmother, Earlene Young. Young was not an appropriate caretaker. Detective Briner responded to three calls of violent domestic assault at Young's home in 2001; Young

-

was arrested for assault on one of the occasions. Police responded to 33 calls from Young's home in 2001. Indeed, as a result of the "continuing domestic violence" and "lack of stability" at Young's home, the juvenile court in Fairfax County denied her petition for custody of A.'s twin siblings in June 2001.

Finally, Wilson herself was not an appropriate caretaker. She has a history of serious emotional disturbance characterized by aggressive and emotional outbursts, poor impulse control, poor judgment, and poor problem-solving skills; those traits interfered with her ability to provide a safe and secure environment for A., as Dr. Kari Moskowitz testified. In 1998, Dr. Moskowitz recommended that Wilson participate fully in individual therapy because her mental health problems required treatment. No evidence was presented at trial showing that Wilson had successfully completed any course of mental health treatment.

Based on this evidence, we cannot say that the circuit court's finding by a preponderance of the evidence that A. was a neglected child was plainly wrong.

### III. Business Records Exception to the Hearsay Rule

Wilson finally contends that the circuit court erred in admitting Detective Briner's testimony regarding calls made from Young's residence to the Spotsylvania County Sheriff's Department, on the ground that mere access to the records is

-

insufficient to establish their reliability and, furthermore, that Briner was neither the custodian of the records nor had access to the original documents that were the basis for the computer records.  We find these arguments to be without merit.

The issue is governed by settled principles regarding the exceptions to Virginia's hearsay rules.  "Hearsay evidence is defined as a spoken or written out-of-court declaration or nonverbal assertion offered in court to prove the truth of the matter asserted therein."  Arnold v. Commonwealth, 4 Va. App. 275, 279-80, 356 S.E.2d 847, 850 (1987).  "[H]earsay evidence is inadmissible unless it falls within one of the recognized exceptions to the hearsay rule and the party attempting to introduce a hearsay statement has the burden of showing the statement falls within one of the exceptions."  Robinson v. Commonwealth, 258 Va. 3, 6, 516 S.E.2d 475, 476-77 (1999) (citations omitted).  Virginia has formulated its modern Shopbook Rule to determine the admissibility of computer records.

> In determining the admissibility of computer records, when the argument has been advanced that they are inadmissible hearsay, we have employed the traditional business records exception to the hearsay rule.
>
> "Under the modern Shopbook Rule, adopted in Virginia, verified regular entries may be admitted into evidence without requiring proof from the regular observers or record keepers," generally limiting admission of such evidence to "facts or events within the personal

-

knowledge of the recorder." However, this principle does not necessarily exclude all entries made by persons without personal knowledge of the facts recorded; in many cases, practical necessity requires the admission of written factual evidence that has a circumstantial guarantee of trustworthiness.

"The trustworthiness or reliability of the records is guaranteed by the regularity of their preparation and the fact that the records are relied upon in the transaction of business by the person or entities for which they are kept." "Admission of such evidence is conditioned, therefore, on proof that the document comes from the proper custodian and that it is a record kept in the ordinary course of business made contemporaneously with the event by persons having the duty to keep a true record."

Kettler & Scott, Inc. v. Earth Tech. Cos., Inc., 248 Va. 450, 457, 449 S.E.2d 782, 785-86 (1994) (citations omitted); see also "Automatic" Sprinkler Corp. of America v. Coley & Petersen, Inc., 219 Va. 781, 792-93, 250 S.E.2d 765, 773 (1979). We find that a proper foundation for admission of Briner's testimony regarding the computer records was established.[2]

Briner had worked in the sheriff's department for two years. He testified that the sheriff's department's computer records are maintained regularly. For every incoming call, the

---

[2] The computer records themselves were not entered into evidence. Because Wilson limits her appeal to whether Detective Briner was the proper custodian of the records and whether mere access to the records is a sufficient basis to establish their reliability for purposes of the business records exception to the hearsay rule, we do not address whether the Commonwealth was required to admit the records as a foundation for the subsequent testimony by Briner.

-

dispatcher enters the information into the computer system, which generates an incident number. Any subsequent reports, paperwork or notes relating to the call and filed by officers or detectives are also entered into the system, by the officer, detective or another individual in the police records division. Detective Briner testified that the computer system serves as a catalog of incoming calls and officers' responses and that the officers use the database to cross-reference cases. Detective Briner has access to the system, which allows him to keep track of the details and status of each case. He can retrieve and enter data as necessary.

Detective Briner demonstrated that he has knowledge of the computer recordkeeping system, and has access to and relies on the records contained in the system. Coupled with his assertions that records are kept on a regular basis, the evidence was sufficient to establish the trustworthiness and reliability of the records. Detective Briner's testimony was, therefore, admissible as a business records exception to the hearsay rule.

Even assuming the admission of Briner's testimony about the computer records was in error, the error was harmless. Where it affirmatively appears that an error of the trial court could not affect the merits of the case, nor prejudice the party appealing, the appellate court will not reverse the judgment on the ground of such error. Speller v. Commonwealth, 2 Va. App.

-

437, 443-44, 345 S.E.2d 542, 546-47 (1986); see also Scafetta v. Arlington County, 13 Va. App. 646, 649, 414 S.E.2d 438, 440 (1992) (finding that nonconstitutional error is harmless when "'it plainly appears from the record and evidence . . . that the parties have had a fair trial on the merits and substantial justice has been reached'" (quoting Code § 8.01-678)).

In the case at bar, even excluding the computer records information, the evidence was sufficient to prove by a preponderance that A. was a neglected child within the meaning of the statute. First, Wilson left A., 21 months old at the time and unable to care for himself, with Scott, a man with a violent history and whom she knew was armed and involved with the robbery and prostitution charges for which Wilson was arrested, and had a violent history. Scott also had been involved in other crimes of violence, as Detective Haynes discovered via the National Crime Information Center database. Wilson admitted to the police that she was concerned Scott might harm A. In addition, the trial court heard testimony regarding Wilson's history of serious emotional disturbance, its effect on her ability to provide a safe and secure home for A., and her failure to seek treatment for her problems.

Second, there existed no other suitable caretaker for A. in Wilson's absence. The child's father was incarcerated in Spotsylvania County at the time. Mr. Wilson's parents told Detective Haynes they did not want to be involved with the

-

situation.  Finally, Young, the person with whom A. was found, was not found to be an appropriate caretaker by the Fairfax juvenile court because the court denied her petition for custody of A.'s twin siblings in June 2001 due to the continuing domestic violence and lack of stability at her home.

The evidence was sufficient, excluding the computer records from consideration, to establish that A. was a neglected child within the meaning of the statute.  Accordingly, we affirm the decision of the trial court.

<u>Affirmed.</u>