COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Decker, Malveaux and Senior Judge Annunziata

ELNORA MOSES

v.       Record No. 1749-17-4

MEMORANDUM OPINION*
PER CURIAM
FEBRUARY 20, 2018

ALEXANDRIA DEPARTMENT OF COMMUNITY
  AND HUMAN SERVICES

FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
Nolan B. Dawkins, Judge

(Paula M. Potoczak; Cathleen A. Tucker, Guardian *ad litem* for
appellant, on briefs), for appellant.

(James L. Banks, Jr., City Attorney; Meghan S. Roberts, Assistant
City Attorney; Ella Ann D'Amico, Guardian *ad litem* for the minor
child, on brief), for appellee.


Elnora Moses (mother) appeals the orders finding that her son, W.M., is abused or

neglected, terminating her parental rights to W.M., and approving the foster care plan goal of

adoption. Mother argues that the trial court erred by finding that she "abused and neglected W.M.

and that it was in the best interests of the child to terminate the residual parental rights of [mother]

to her child, W.M., and to permit the adoption." Upon reviewing the record and briefs of the

parties, we conclude that this appeal is without merit. Accordingly, we summarily affirm the

decision of the trial court. See Rule 5A:27.

BACKGROUND

"On appeal, 'we view the evidence and all reasonable inferences in the light most

favorable to the prevailing party below, in this case the Department.'" Farrell v. Warren Cty.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Dep't of Soc. Servs., 59 Va. App. 375, 386, 719 S.E.2d 329, 334 (2012) (quoting Jenkins v. Winchester Dep't of Soc. Servs., 12 Va. App. 1178, 1180, 409 S.E.2d 16, 18 (1991)).

Mother is the biological mother to W.M., who was born in Texas. While in Texas, the Texas Department of Family Services investigated the family seven times, between May 2014 and April 2016, for abuse or neglect because mother alleged that W.M. was being sexually abused. Each of these investigations concluded that there had been no abuse or neglect.

In August 2016, mother and W.M. moved from Texas to Alexandria, Virginia. W.M. was four years old at the time. On August 8, 2016, they arrived in Virginia and stayed at an extended stay hotel. While they stayed at the hotel, mother believed that she was "violated at night by an unknown person." Despite the fact that her room was locked and furniture was pushed in front of the door and not moved, mother continued to believe that she had been assaulted. She also believed that W.M. had been assaulted. On August 30, 2016, mother checked out of the hotel due to insufficient funds.

On that same day, mother took W.M. to the Alexandria Police Department because "she was afraid he [W.M.] would get hurt if he stayed with her and that he wasn't safe with her." Mother told the police that she thought they were being sexually assaulted. When asked why she thought she was assaulted, mother explained that when she woke up, she "felt pressure over her entire body." However, nobody was there. The room was secure, and she was still fully clothed as she had been when she went to bed. The police called Child Protective Services (CPS), who removed the child from mother and placed him in foster care. According to the police officer, mother "willfully gave up" W.M. to CPS and said that "it was for the best and that he would be better off staying with someone else."

After further discussion with the police, mother voluntarily agreed to be admitted to INOVA Alexandria Hospital for a mental evaluation. The police transported mother to the

hospital on August 30, 2016. However, on August 31, 2016, mother was released and returned to the Alexandria Police Department to inquire about her car. She told the police officer that she was "not properly mentally evaluated" at the hospital. The police subsequently learned that mother was diagnosed as delusional and left the hospital before a temporary detention order could be issued. As the police continued to talk with mother, mother became more irrational. The police took mother for a mental evaluation, and an emergency custody order was obtained. Mother was transported to INOVA Mount Vernon Hospital for treatment.

Mother remained at INOVA Mount Vernon Hospital until September 6, 2016. While at the hospital, mother refused to take any type of psychotic medication. She disagreed that she had delusional disorder and continued to believe that she was being sexually assaulted at night.

After her release from the hospital, mother went to the Alexandria Community Shelter. She continued to believe that she was being sexually assaulted at night, but there was no evidence that any assaults had occurred. Mother was not compliant with the rules of the shelter. In March 2017, mother was discharged from the shelter and had no transitional housing in place. Mother was homeless from March until May 2017.

On May 22, 2017, the Alexandria Juvenile and Domestic Relations District Court terminated mother's parental rights to W.M. and approved the foster care plan goal of adoption. Mother appealed the ruling to the circuit court.

On August 29 and 30, 2017, the parties presented their evidence and argument. Mother testified that she worked at a restaurant in Woodbridge and earned $13 per hour. She explained that she could work up to thirty-six hours per week at the restaurant, but she had worked only twenty-eight hours the week prior to court. She testified that "[n]othing's in stone" about her hours. Mother also stated that she worked as a hospital greeter one day, every other week, for an eight-hour shift. At the time of the trial, mother was renting a room in a townhome for $1,100

per month, which included utilities. She acknowledged to the social worker that "she has more money going out than coming in" and would not be able to sustain her housing much longer. She testified that she hoped to move to Woodbridge to be closer to work and W.M.'s school.

While W.M. was in foster care, the Department referred mother to Dr. Travis Flower for a parental screening assessment and mental health evaluation. Mother completed the evaluation, and Flower wrote a report on October 31, 2016. Flower diagnosed mother with delusional disorder, persecutory type. Flower testified that mother's "delusional beliefs refer more or less exclusively to this persistent, fixed concern that she has that she is being repeatedly sexually assaulted during her sleep and that her son has been repeatedly sexually assaulted while they are sleeping." Flower opined that mother's prognosis was "very, very uncertain" because patients with delusional disorder do not always participate in mental health treatment. When they do participate, mental health treatment may not alleviate all of the symptoms. Mother's symptoms have existed for approximately ten years,[1] and her insight was "grossly impaired." Flower explained that mother's lack of insight meant that she was "at more risk to refuse to participate in treatment or drop out of treatment."

Flower was concerned that mother's delusions had the potential to harm W.M. Flower explained that mother repeatedly took W.M. to doctors because she thought he was being sexually abused. Flower feared that mother's actions and statements could be emotionally disturbing to W.M.

As a result of Flower's examination, the Department referred mother for individual therapy. In October 2016, mother started meeting with Regina McGloin, a therapist at

---

[1] Mother told Flower that she "believes she was being raped 'long before I knew it was happening,'" but she thinks it started in 2007.

Alexandria CSB. McGloin provided supportive counseling to mother. McGloin testified that they were building rapport and trust, but they were not addressing mother's delusions.

The Department also referred mother for a psychiatric evaluation. Mother missed her first appointment, but did meet with Dr. Dean Inoye on January 11, 2017. Inoye diagnosed mother with provisional delusional disorder, persecutory type. Mother disagreed with the diagnosis and refused to take any medications. As of the date of the circuit court hearing, mother continued to disagree with the diagnosis and refused to take any medications.

The Department provided play therapy for W.M. At first, his counselor found him to be "very angry and hyper-aroused," which was typical of a child who had experienced trauma. Since he has been in foster care, however, W.M. has improved and is no longer angry. His counselor explained that W.M. needs a stable and predictable living environment, which he did not have while living with mother.

After hearing all of the evidence and argument, the trial court found that W.M. had been abused or neglected, and it was in the child's best interests to terminate mother's parental rights. The trial court approved the foster care plan's goal of adoption. This appeal followed.

ANALYSIS

"Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Fauquier Cty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190, 717 S.E.2d 811, 814 (2011) (quoting Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986)). "When considering termination of parental rights, 'the paramount consideration of a trial court is the child's best interests.'" Id. (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991)).

*Abuse and neglect*[2]

Mother argues that the trial court erred in finding that mother abused and neglected W.M.

Mother emphasizes that none of the child protective service agencies in Texas found that W.M.

had been abused or neglected. She further stresses that she did not physically abuse the child.

The trial court found that the child was abused or neglected pursuant to Code

§ 16.1-228(5), which states that an abused or neglected child is a child "[w]ho is without parental

care or guardianship caused by the unreasonable absence or the mental or physical incapacity of

the child's parent, guardian, legal custodian, or other person standing *in loco parentis*." "[T]he

statutory definitions of an abused or neglected child do not require proof of actual harm or

impairment having been experienced by the child." Jenkins, 12 Va. App. at 1183, 409 S.E.2d at

19.

The trial court explained that it did not believe that the child was physically abused.

Rather, the trial court believed that the child's "care has been impacted by the parental issues that

[mother] has with her mental health." The trial court further found that due to mother's mental

health issues, she "is not capable of providing a safe environment for this child."

The evidence supports the trial court's findings. Mother brought W.M. to the police

department on August 30, 2016. She reported that she was afraid for his safety and willingly

gave him to the Department. Mother was hospitalized twice for her mental health issues and

diagnosed with a delusional disorder. Mother was unable to care for W.M. Despite the

professionals' diagnosis and suggested treatment, mother refused to accept the diagnosis and

---

[2] Appellant mentions Code § 16.1-228 in her brief, but fails to cite any other legal authority to support her argument. Assuming without deciding that such a reference is sufficient to meet the requirements of Rule 5A:20(e), we address the merits of her argument regarding the trial court's finding that the child was an abused and neglected child.

comply with the treatment. The trial court did not err in finding that the child was an abused or neglected child.

*Termination of parental rights*

Mother argues that the trial court erred in terminating her parental rights and approving the foster care plan's goal of adoption. Mother contends that she complied with the Department's requests and remedied the situation that led to the child being placed in foster care.

The trial court terminated mother's parental rights pursuant to Code § 16.1-283(C)(2), which states that a court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

The Department provided numerous services to mother. Several mental health professionals diagnosed mother with delusional disorder and recommended medication and counseling. The trial court recognized that "treatment in this kind of case can only be successful, if at all, if the patient is willing to accept that treatment." Despite the counseling and testing, mother refused to acknowledge that she had a mental illness, and she would not take medication. She continued to have delusions and believe that she was sexually assaulted at night. Mother's counselor stated that they had not confronted the delusions. Flower opined that mother's prognosis was "very, very uncertain."

Furthermore, the trial court expressed concern about mother's plans to move out of the area, which mother told Flower and her counselor that she would do after she received custody of her child. The trial court stated that if she moved without first seeking mental health treatment, then the court would be transferring a problem to another jurisdiction.

In addition, the trial court noted that mother's housing situation was precarious. Mother was employed, but her income was not sufficient to cover her rent, much less her other living expenses. Mother stated that if the child was returned to her, then she would place him in day care while she worked. However, the trial court questioned how she could afford to pay day care with her salary.

At the time of the trial, the child had been in foster care for twelve months. His counselor testified that he was improving and needed a stable home. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Tackett v. Arlington Cty. Dep't of Human Servs., 62 Va. App. 296, 322, 746 S.E.2d 509, 522 (2013) (quoting Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990)).

Contrary to mother's arguments, the evidence supports the trial court's ruling that it was in the child's best interests to terminate mother's parental rights pursuant to Code § 16.1-283(C)(2). Mother was unable to remedy the situation that led to the child being placed in foster care. The trial court did not err in approving the foster care plan's goal of adoption.

CONCLUSION

For the foregoing reasons, the trial court's ruling is summarily affirmed. Rule 5A:27.

Affirmed.